IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH CROSBY,                          )
                                         )
                        Plaintiff,       )
                                         )
v.                                       )        CIVIL ACTION NO. 07-501
                                         )
                                         )
UPMC,                                    )
                                         )
                        Defendant.       )


## MEMORANDUM OPINION

CONTI, District Judge.

In this memorandum opinion the court considers the motion for summary judgment

(Docket No. 23) filed by defendant UPMC ("UPMC" or "defendant"), against all claims asserted

by plaintiff Deborah Crosby ("Crosby" or "plaintiff") under the Americans With Disabilities Act

("ADA"), 42 U.S.C. §§12101 *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43

PA. CONS. STAT. §§ 951 *et seq.* in her complaint (Docket No. 1).[1]  After considering the joint

concise statement of material facts ("joint statement" or "JS") (Docket No. 35),[2] and the other

submissions of the parties, and based upon the undisputed facts of record, and all reasonable

inferences drawn in favor of plaintiff, defendant's motion for summary judgment will be granted.

---

[1]Plaintiff also refers to Title VII of the Civil Rights Acts of 1964 and 1991 in the jurisdictional section and
in the prayer for relief to count I of her complaint, and, on the accompanying civil cover sheet, the box for Civil
Rights-Employment is marked as opposed to the box for Americans with Disabilities-Employment.  Plaintiff,
however, advances no Title VII claims in her complaint, or in any subsequent submissions to the court, and as such
the court will disregard the invocation of Title VII.

[2]The court takes this opportunity to remind the parties that a statement of material facts accompanying
summary judgment submissions is not the proper vehicle for advancing arguments, which is properly relegated to the
parties' briefs.  Any argument contained in a statement of material facts will not be considered by the court.

# Factual and Procedural Background

From November 14, 2005, through January 23, 2006, Crosby provided services as a home health nurse for UPMC/South Hills Health System Home Health, LP ("Home Health"). (JS ¶1.) According to UPMC, Crosby was employed by Home Health, whereas Crosby maintains that she was an employee of UPMC in its Home Health business unit. (*Id*.) Crosby avers that employees hired by Home Health were welcomed to the UPMC team, were paid by UPMC and required to have their pay directly deposited, and UPMC retained the power to terminate employment and refuse to rehire. (JS ¶102.) UPMC, however, maintains that those employees were at all times employed by the relevant business unit. (*Id.*) Home Health employs approximately 650 individuals and has its principal place of business in Seven Fields, Pennsylvania. (JS ¶2.)

During the time period relevant to this lawsuit, according to UPMC, Home Health was a joint venture, limited partnership comprised of UPMC Home Health, South Hills Health System Home Health Agency, UPMC Beaver Valley Home Health, and UPMC Horizon Home Health; Home Health provided in-home and community based medical services. (JS ¶3.) UPMC avers that the governance of Home Health is conducted by a management committee, which operates as a board of directors, but Crosby contends that during her employment Home Health's governance was performed by a board of managers consisting of representatives from UPMC and South Hills Health System. (JS ¶6.) UPMC states that Home Health is responsible for its own budget and compensation determinations, although its payroll functions are performed by UPMC. (JS ¶7.) Crosby alleges that her salary was paid by UPMC under UPMC's employer identification number, which also appeared on her W-2 form and ERISA plan summary. (*Id.*)

Crosby also contends that the compensation packages for Home Health employees were subject to UPMC policies.  (*Id.*)

Although Home Health is responsible for its own budget and balance sheets and accountable for its own profits and losses, according to Crosby, its budget is subject to the approval of UPMC, its employees' wages are funded by UPMC, and Home Health is accountable to UPMC.  (JS ¶8.)  Home Health's personnel policies and procedures, including those pertaining to hiring, benefits, leaves of absence, discipline, and termination, were administered by its own human resources consultant, but Crosby maintains that the personnel policies followed were those of UPMC, and the human resources consultant was UPMC trained and answered to a senior vice president of UPMC.  (JS ¶9.)  The human resources consultant, who worked exclusively for Home Health during Crosby's employment, was Tracey Kolo ("Ms. Kolo").[3]  (JS ¶10.)  UPMC offers benefit plans to employees of all its member organizations, including Home Health, which Crosby contends are funded by and subject to the authorization of UPMC.  (JS ¶11.)  UPMC member organizations employ an internet-based application known as MyHUB, a centralized human resources information database.  (*Id.*)

Crosby's supervisor at Home Health was Marylou Nemeth ("Ms. Nemeth").  (JS ¶14.) As a home health nurse, Crosby was responsible for providing in-home nursing care to patients, which required frequent lifting of up to 50 pounds and occasional lifting up to 100 pounds.  (JS ¶15.)  Crosby's first six weeks of employment were an orientation period consisting partly of classroom instruction from Carol Rogers, RN, ("Nurse Rogers"), and clinical instruction from

---

[3]Ms. Kolo is frequently referred to by her former name, Tracey Stange, in the record.

Judy Neville, RN ("Nurse Neville"). (JS ¶16.) UPMC alleges that on December 19, 2005,[4] in her sixth week with Home Health, Crosby experienced an adverse reaction to a steroid injection in her hip; the injection was to treat bursitis pain in the joint. (JS ¶17.) Crosby called off work to Ms. Nemeth, advising that she expected to return to work the following day. (*Id.*)

According to UPMC, upon returning to work the next day, Crosby informed Nurse Rogers and Nurse Neville that on an occasion the previous week she had difficulty standing after sitting on the floor while administering care to a patient, and later advised Nurse Rogers and Ms. Nemeth that she was receiving treatment from an orthopedist for bilateral hip pain and that the physical demands of the home health nurse position may exceed her physical capability. (JS ¶18.) Crosby's version is that she told Nurses Rogers and Nurse Neville, as well as Ms. Nemeth, about her reaction to the steroid injection, which occurred on December 15, 2005, but that she further informed them that (1) on December 17, 2005, she had been in an automobile accident, but had no work restrictions from a physician at that time, and (2) her hip symptoms were abating, but that she was experiencing increasing back pain and radiculopathy from the accident. (*Id.*) Nurse Rogers suggested a reduction in hours to casual employment, but Crosby was not interested in that arrangement. (*Id.*) Crosby was able to work the remainder of that week, although she experienced a progressive increase in her back pain. (JS ¶20.)

Crosby called off work again on December 29, 2005,[5] and advised Ms. Nemeth that her physician ordered her to cease working until she could undergo an MRI sometime in the following week. (JS ¶21.) Crosby further informed Ms. Nemeth that she was seeking a position

---

[4]Defendant erroneously identifies the date as December 19, 2006, in the joint statement.

[5]Defendant erroneously identifies the date as December 29, 2008, in the joint statement.

with another UPMC entity that required less physical exertion. (JS ¶22.) According to Crosby,

when she informed Ms. Nemeth on December 29, 2005, about her disability and request for

alternative employment, Ms. Nemeth replied "be sure you can do the next job you take." (JS

¶101.) UPMC, however, disputes that Crosby made those representations to Ms. Nemeth, or that

Ms. Nemeth made the statement alleged. (*Id.*) UPMC avers that Crosby indicated to Ms.

Nemeth at the time that she intended to return to her position as a home health nurse once she

had medical clearance to do so, but Crosby denies giving any such assurance. (JS ¶22.) Crosby

presented a physician's prescription to Ms. Nemeth proscribing her from engaging in any work

due to neck and back strain until seen again by her physician. (JS ¶23.) Because Crosby would

be off work for more than three days, Ms. Nemeth instructed Crosby to contact Ms. Kolo to

request a leave of absence. (JS ¶24.) Crosby alleges that on December 29, 2005, she reported

her disability to Ms. Kolo and indicated she was seeking alternative employment, although

UPMC disputes that she indicated to Ms. Kolo that she was disabled or that she could return to

work. (JS ¶100.)

On December 30, 2005, Crosby made a disability claim with UNUM Provident, pursuant

to Ms. Kolo's instruction. (*Id.*) According to UPMC, Crosby, as a new employee, was not

eligible for leave, but Home Health nevertheless granted her two weeks of personal leave from

December 29, 2005, to January 11, 2006. (JS ¶25.) Crosby asserts that she had entered an

agreement with UPMC during the recruitment process in which she was granted 120 hours of

leave, and that, furthermore, she was entitled to six months of short-term disability leave. (*Id.*)

On January 3, 2006, before the end of her approved leave, Crosby informed Ms. Nemeth that her

next appointment with her physician would not be until January 12, 2006. (JS ¶26.) UPMC

contends that, despite the expiration of her personal leave on January 11, 2006, Crosby's employment was continued pending an update from her physician. (JS ¶27.) Crosby disputes that her leave expired on January 11, 2006. (*Id*.)

On January 17, 2006, Crosby reported to Ms. Nemeth that she was unable to resume her duties as a home health nurse for an indefinite period of time, and subsequently provided a physician's prescription confirming her inability to resume those duties. (JS ¶28.) The prescription stated "[p]lease [e]xcuse [Crosby] from work until further notice." (Crosby's Deposition, Feb. 5, 2008, Ex. 14.) Crosby claims, however, that she informed Ms. Nemeth, Ms. Kolo, Jamey Jones ("Ms. Jones"), an employment specialist with UPMC Health Plan ("Health Plan"), Kurt Stillwagon ("Mr. Stillwagon"), a recruiter with Health Plan, and UNUM Provident, the third party administrator of UPMC's short-term disability plan, that she was endeavoring to secure alternative employment at the sedentary exertional level. (*Id*.) According to UPMC, because of Crosby's exhaustion of all available leave and her inability to offer an approximate return to work date, Crosby's employment was terminated as of January 23, 2006. (JS ¶29.)

Crosby argues that she repeatedly assured Ms. Nemeth, Ms. Jones, Mr. Stillwagon, and Ms. Kolo that she was immediately available to return to work in a sedentary capacity, that she was attempting to secure such employment, and that she had applied for such a position with another UPMC entity. (*Id*.) UPMC avers that Crosby supplied very little information about her medical condition other than her work restrictions, but Crosby maintains that not only did she divulge all information known to her, but also that she executed an authorization for UPMC to obtain information from her medical records and that all the information relative to her condition was available to UPMC because it was held by various entities controlled by UPMC. (JS ¶30.)

UPMC alleges Crosby did not request to return to work in a limited capacity, nor did she provide clearance from her physician indicating she was able to work in any capacity. (JS ¶31.) Crosby states that she communicated her interest in working at the sedentary level with Ms. Nemeth and reiterates that she applied for a sedentary employment position. (*Id.*)

During the time of Crosby's disability, UPMC offered a Return to Work Assistance Program (the "Program") for employees with physical restrictions on work activities. (JS ¶96.) Crosby contends that Ms. Kolo or Ms. Nemeth could have referred her to the Program. (JS ¶97.) The Program was the recipient of the 2007 Quality Leadership Award from the Certification of Disability Management Specialists Commission , in recognition of the Program's innovative plan to promote health and productivity of the workforce. (Ms. Kolo's Deposition, Mar. 1, 2008, Ex. 9.) UPMC contends that Crosby was not eligible for the Program through UPMC Work Partners ("Work Partners"), which UPMC identifies as Home Health's third-party administrator for worker's compensation claims, because her physician did not provide a release for her to work in any capacity. (JS ¶32.) Crosby responds by asserting that she repeatedly told Ms. Nemeth, Ms. Kolo, and Ms. Jones that she could perform sedentary work, that she was treated by UPMC physicians, and that she could have been recommended to Work Partners by Ms. Nemeth or Ms. Kolo. (*Id.*)

Crosby never regained the ability to meet the physical requirements of the home health nurse position, nor could any reasonable accommodation allow her to be able to perform the essential functions of that job. (JS ¶¶33-34.) On April 14, 2006, plaintiff underwent a functional capacity evaluation by UPMC St. Margaret. (JS ¶99.) That evaluation indicated that Crosby was incapable of performing the duties of a home health nurse, but that she could perform work at the

sedentary exertional level. (*Id.*) UPMC disputes that Crosby underwent an evaluation and disputes the alleged results of any evaluation, because Crosby relies upon unsupported, unauthenticated documents. (*Id.*) Crosby was awarded short-term disability benefits through UNUM Provident, Home Health's disability claims administrator, beginning December 29, 2005, for twenty-six weeks. (JS ¶35.)

The short-term disability plan is funded by UPMC and names UPMC as the employer, and provides that "the employer is the final decision-maker as to the interpretation of the Plan and the payments made thereunder." (JS ¶88.) UPMC disputes the validity of the facts related to the short-term disability plan, arguing that those facts are supported by unauthenticated documents, the origin of which UPMC is unaware. (*Id.*) Under the short-term disability plan, all medical information acquired by UNUM Provident is the property of UPMC, although UPMC disputes this assertion. (JS ¶89.) Crosby authorized the release of medical information to UNUM Provident on January 12, 2006,[6] when her claim for benefits commenced. (JS ¶90.)

Health Plan offers an array of group health insurance services to UPMC and other regional employers. (JS ¶36.) UPMC, the majority shareholder of Health Plan, provides certain services to Health Plan such as human resources, legal, and information technology support. (JS ¶37.) Health Plan's principal place of business is located at One Chatham Center in Pittsburgh and it employs approximately 1,300 individuals. (JS ¶38.) Health Plan employs its own management team, which includes an executive officer of UPMC, and Health Plan is governed by a board of directors. (JS ¶¶39-40.) UPMC avows that Health Plan determines its own employee compensation packages, which are paid from Health Plan's own budget. (JS ¶41.)

---

[6]Plaintiff erroneously identifies the date as January 12, 2006, in the joint statement.

8

Crosby asserts that Health Plan's employees' compensation packages were subject to UPMC policies. (*Id.*)

Health Plan is responsible for its own budget and balance sheets and accountable for its profits and losses, but Crosby declares that its budget is subject to UPMC approval and that Health Plan is accountable to UPMC. (JS ¶42.) Crosby contends that Health Plan is subject to all UPMC personnel policies, although UPMC avows that Health Plan had discretion in administering the policies. (JS ¶43.) Health Plan retains its own human resources personnel who are responsible for implementing the employment policies with respect to its employees, including those relating to hiring, leaves of absence, and termination, but Crosby maintains that Home Health's personnel policies were those of UPMC. (JS ¶44.)

Crosby contacted Ms. Kolo in late 2005 or early 2006, while still employed as a home health nurse, to explore the prospect of securing other employment with a UPMC business entity. (JS ¶45.) Ms. Kolo informed Crosby that permission from her supervisor would be required in order to be considered for employment with another UPMC entity because she had been in her position with Home Health for less than a year. (JS ¶46.) Shortly thereafter, Crosby requested information regarding applying for a staff attorney position[7] available at Health Plan from Ms. Jones, an employment specialist with Health Plan. (JS ¶47.) Ms. Jones informed Crosby that she must submit her application for the staff attorney position electronically through MyHUB, UPMC's system-wide human resources database, because Crosby was currently employed by another UPMC entity. (JS ¶48.) Because the staff attorney position posting on MyHUB had

_____

[7]Crosby earned a law degree from the University of Pittsburgh and had approximately twelve years of experience as an attorney in various legal positions. (JS ¶47 n.2; Crosby's Deposition, Feb. 5, 2008, at 38-43.)

expired after seven days, Ms. Jones made the page visible again on MyHUB at Crosby's request. (JS ¶49 n.3.)  On January 1, 2006, Crosby completed her application.  (JS ¶49.)  UPMC declares that Ms. Jones did not discover that Crosby had only been in her position with Home Health for a few weeks until she began to process Crosby's application.  Crosby, however, contends that Ms. Jones was aware of her length of service with Home Health before re-listing the position on MyHUB, and even told Crosby that the listing could not be reopened until Ms. Nemeth provided the transfer permission.  (JS ¶50.)

According to Health Plan's recruitment and selection policy, an employee is prohibited from transferring between UPMC member organizations within the first twelve months of employment, which Crosby characterizes as a UPMC policy proscribing "internal" transfers by employees with less than twelve months of continuous service at "UPMC."  (JS ¶51.)  Ms. Jones stated that Health Plan would routinely waive the twelve-month service requirement if written permission for the transfer was received from the applicant's supervisor.  (JS ¶52.)  Ms. Jones informed Crosby about the necessity of having written permission from Ms. Nemeth to be considered for the position because she did not have the requisite amount of time in her current position.  (JS ¶53.)  Crosby, however, attests that Ms. Jones related this information to her prior to reopening the position on MyHUB, leading Crosby to believe that Ms. Nemeth had forwarded by email the necessary permission when she saw the position posted again on MyHUB.  (*Id.*) Crosby asserts that the posting was refreshed on MyHUB specifically for her.  (*Id.*)  UPMC counters that the purpose of posting the position, by definition, is to make the position available to a pool of applicants.  (JS ¶53 n.4.)

UPMC notes that the resume submitted with Crosby's application for the legal position did not denote her current position with Home Health. (*Id*.) Crosby retorts that it was unnecessary to submit a resume disclosing her current position with Home Health because (1) she had discussed that situation on the phone with Ms. Jones, and (2) the application was being submitted through MyHUB, which was only accessible by internal candidates, and for that reason her position with a UPMC entity would be known to anyone reviewing the application. (JS ¶53.) Any UPMC entity receiving an application for an internal transfer was granted access to the applicant's employee file and work records, although the records were limited to work history, current salary, attendance record, performance history, corrective action history, and performance appraisals. (JS ¶85.) Crosby was made aware that it was her responsibility to ensure that permission from Ms. Nemeth was received by Health Plan in order for her application to be considered. (JS ¶54.) It is disputed whether Crosby ever requested written permission for the transfer from Ms. Nemeth, and whether, after the submission of her application on January 1, 2006, Crosby confirmed with Ms. Nemeth, Ms. Jones, or Mr. Stillwagon, that the written permission was actually received by Health Plan. (JS ¶55.)

During a phone conversation in late December 2005, Ms. Nemeth purportedly told Crosby that she had "never stood in the way of a transfer," but UPMC avers that Crosby failed to follow up with Ms. Nemeth or provide Ms. Nemeth with Ms. Jones' email address in writing. (JS ¶56.) Crosby asserts that, although she did not follow up in writing, she did phone Ms. Nemeth and forwarded Ms. Jones' email, which included Ms. Jones' email address, to Ms. Nemeth. (*Id*.) Ms. Jones claims that she never received the necessary written permission, which resulted in her rejection of Crosby's application as not qualified for the position in January or

early February 2006. (JS ¶57.) Ms. Jones changed her job on February 5, 2005, and the decision to reject Crosby's application occurred before then. (JS ¶57 n.5.) Although Ms. Jones asserts that she rejected the application because the requisite permission was not provided, Crosby states that she was informed by Ms. Jones that the permission had been received by Health Plan. (JS ¶57.)

The staff attorney position with Health Plan was posted from November 22, 2005, until February 28, 2006. (JS ¶58.) Although interviews were conducted with some of the applicants, the position was closed without being filled. (JS ¶59.) In March 2006, the position was reopened only to the original pool of qualified candidates. (*Id.*) Crosby did not resubmit an application after her original application on January 1, 2006. (JS ¶60.) The final hiring decision for the staff attorney position was made by Daniel Vukmer ("Mr. Vukmer"), general counsel, chief compliance officer, and vice president of product development for Health Plan. (JS ¶61.) The successful candidate was hired on or about March 28, 2006, from the original pool of qualified applicants; Crosby admits the position was filled at the time UPMC alleged. (JS ¶62.) According to UPMC, no individual making employment decisions on behalf of Health Plan, including Ms. Jones and Mr. Vukmer, was aware of Crosby's medical condition or physical limitations. (JS ¶63.) Crosby claims, however, that she personally notified Ms. Jones and Mr. Stillwagon about her back injury and her inability to meet the physical demands of the home health nurse position. (*Id.*) Crosby was never apprised about the reasons why she was not considered for the staff attorney position. (JS ¶64.)

Crosby alleges total disability from performing the duties of a home health nurse and that no reasonable accommodation would make it possible to perform the essential functions of that

job. (JS ¶66.) Despite being proscribed from engaging in any work activity by the physician's prescription provided to Home Health, Crosby maintains that she was able to perform sedentary work, and that Ms. Nemeth, Ms. Jones, Ms. Kolo, and Mr. Stillwagon were advised about her ability to do that kind of work. (JS ¶67.) Neither Ms. Nemeth nor Ms. Kolo made any inquiry into other work Crosby was capable of doing after her injury. (*Id*.) Crosby reports informing human resources representatives of both Home Health and Health Plan that she had the ability to perform sedentary employment, a claim that UPMC disputes. (JS ¶92.)

Crosby is generally able to perform the necessary functions of daily living, although she has difficulty with certain tasks, and she exercises and engages in a physical therapy routine. (*See generally* JS ¶¶68-75.) Crosby's physicians restricted her to lifting no more than 10 pounds and cautioned that she should neither walk nor stay stationary for a long period of time, limitations which were identified in the functional capacity evaluation conducted at the behest of UNUM Provident, UPMC's agent. (JS ¶76.) The results of the functional capacity evaluation requested by UNUM Provident to determine the extent of Crosby's disability were not received until September 2006,[8] although UPMC asserts that the face of the document indicates that it was not completed until October 2006. (JS ¶93.)

According to UPMC, Crosby reported to Ms. Nemeth on January 3, 2006, that her injury may have resulted from an incident which occurred while caring for a patient on or about December 15, 2005, making the injury work related. (JS ¶77.) Crosby, however, denied that she ever expressed that the injury was work related, and stated that on December 20, 2005, she informed Ms. Nemeth, Nurse Neville and Nurse Rogers, that she had experienced discomfort in

---

[8]Plaintiff erroneously identifies the date as September 2005 in the joint statement.

her hip while rising from the floor at a patient's house, but the symptoms were subsiding. (*Id.*)

Believing the injury may be work related, under UPMC's version of the facts, Ms. Nemeth told

Crosby to submit a worker's compensation claim to Work Partners. (JS ¶78.) Crosby concedes

that she was instructed to report the injury to Work Partners. (*Id.*) Any employee submitting a

worker's compensation claim with Work Partners was required to treat with UPMC panel

physicians. (JS ¶84.) On or about January 5, 2006, Crosby submitted a claim for worker's

compensation which was ultimately denied, although Crosby contends that she never intended to

pursue a claim. (JS ¶79.) Crosby filed her worker's compensation claim because she was told to

do so by Ms. Nemeth, and because she wanted to "preserve the record" for a separate lawsuit to

which she was a party involving an automobile accident. (JS ¶80.) Crosby filed a claim of

discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 30,

2006, which was received by UPMC on April 6, 2006. (JS ¶81.)

Plaintiff commenced this action by filing a complaint on April 17, 2007, alleging in count

I (a) discrimination under the ADA for failure to accommodate, harassment,[9] and wrongful

termination, and (b) a retaliation claim under the ADA for engaging in protected activities. In

count II plaintiff makes the same claims under the PHRA. Defendant filed an answer to

plaintiff's complaint on July 2, 2007. The parties engaged in discovery, and on June 20, 2008,

defendant filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. The motion was briefed by both parties and a joint statement of material facts was

filed. The court now considers defendant's motion.

---

[9]Plaintiff abandoned her harassment claim.

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party.  *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted.  Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

**Discussion**

## I. General

    Plaintiff asserts claims of disability discrimination and retaliation under the ADA and PHRA[10] based upon defendant's failure to offer her a reasonable accommodation, her termination, and her failure to be hired for a position for which she applied. The ADA makes it unlawful for an employer to discriminate against any person with respect to, *inter alia*, advancement, discharge, training, and other terms, conditions, or privileges of employment on the basis of a statutorily recognized disability. 42 U.S.C. § 12112(a). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

## II. Single Employer

    Before turning to plaintiff's claims of discrimination and retaliation, the court is first tasked to address the argument advanced by defendant that plaintiff was not employed by UPMC, the defendant named in this lawsuit, and, *ergo*, defendant is not liable to plaintiff for any of the alleged discriminatory or retaliatory actions. The United States Court of Appeals for the Third Circuit announced the standard for determining when a conglomeration of entities can be considered a "single employer" in the employment discrimination context in *Nesbit v. Gears*

---

[10]The elements of a PHRA disability discrimination claim are the same as the ADA elements. The analysis of the ADA claims will be dispositive of the PHRA claims. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Keeley v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

*Unlimited, Inc.*, 347 F.3d 72 (3d Cir. 2003), *cert. denied*, 541 U.S. 959 (2004). The factors considered are whether (1) a company has split itself into separate entities for the purpose of evading Title VII, (2) a parent company has directed a subsidiary's discriminatory acts, or (3) there is a substantive consolidation when the "operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." *Nesbit*, 347 F.3d at 85-87.

Nothing in the record suggests that either element one or element two is applicable, so it is the third element to which the court now turns its attention. A substantive consolidation "is an equitable remedy and is difficult to achieve." *Id*. at 86. Factors to be considered in an operational entanglement inquiry include:

> (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other.

*Id.* at 87.

Before embarking on the analysis, however, the court points out that *Nesbit* involved the situation where the individual corporate entities had less than the threshold amount of employees for purposes of being considered an employer within the meaning of Title VII, and as such *Nesbit* may arguably not be a relevant consideration in this case. *See Daniel v. City of Harrisburg*, No. Civ.A. 1:05-CV-2126, 2006 WL 543044, at **3-4 (M.D. Pa. Mar. 6, 2006). The analysis in *Nesbit*, however, addressed the broader question concerning substantive consolidation and that analysis is relevant to the case here presented. *Id.* at *4. With respect to those factors, plaintiff

17

notes that both Home Health and Health Plan have a UPMC officer on their governing boards, and alleges that they were subject to UPMC personnel policies. Defendant counters that the entities were governed by their own independent boards, despite the presence of a UPMC officer, and that the personnel policies adopted from UPMC were implemented at their discretion.

Plaintiff observes that there is a UPMC logo on top of the Steel Tower and that UPMC boasts "46,000 employees," a claim only valid by aggregating the employees of all UPMC business units. Defendant argues that neither Home Health nor Health Plan have offices in the Steel Tower and that employment is at all times with the relevant business unit. Defendant does not squarely address the 46,000 employee issue. Plaintiff presented evidence that (1) her paychecks came from UPMC and that UPMC required that she have direct deposit of her pay, (2) her W-2 listed UPMC's employer identification number, and (3) the budgets for Home Health and Health Plan were subject to UPMC's approval. Defendant ripostes by arguing that Home Health and Health Plan contracted with UPMC for payroll services and that each maintained their own balance sheet and budget, and were responsible for their payrolls from their budgets. There is no evidence of record that either Home Health or Health Plan did business exclusively with UPMC, and plaintiff makes no such allegation.

Although defendant raises arguments for observing the corporate form, the court in resolving this motion will assume – for purposes of argument – that plaintiff presented sufficient evidence to raise a genuine issue of material fact concerning whether she was employed by UPMC. *See Walker v. Corr. Med. Sys.*, 886 F. Supp. 515, 521 (W.D. Pa. 1995).

## III. Disability Discrimination Claims

### A. Prima Facie Case

"In order to make out a *prima facie* case of disability discrimination under the ADA and PHRA, a plaintiff must establish that s/he (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002) (citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (footnote omitted).

#### 1. Qualified Individual With a Disability

The first task is to determine if plaintiff is a qualified individual with a disability. In *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999), the Court of Appeals for the Third Circuit stated:

> [a] "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Id.* at 305-06.

Plaintiff claims to be disabled in that she "is limited in the major life activity of working by physical restrictions which prohibit her from working at any job which requires physical activity above the sedentary level." (Pl.'s Br. Opp'n Summ. J. at 6.) The United States Court of Appeals for the Third Circuit, in *Marinelli v. City of Erie*, 216 F.3d 354 (3d Cir. 2000), foreclosed that basis for pursuing disability claims under the ADA:

general averments [of exertional restriction are] insufficient to establish disability status under the ADA. In *Broussard v. University of California*, 192 F.3d 1252 (9th Cir. 1999), the plaintiff introduced a vocational expert's opinion that she could only work at the "sedentary to light" categories of workload. *See id.* at 1257. The Ninth Circuit held that because an expert's opinion only took "*categories* of jobs" into account, such evidence could not serve to defeat a motion for summary judgment with respect to whether the plaintiff was sufficiently limited from working. *See id.* at 1258 (emphasis added) (citing *Thompson v. Holy Family Hospital*, 121 F.3d 537 (9th Cir. 1997) (per curiam)). Likewise, in *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369 (6th Cir. 1997), the Sixth Circuit held that a plaintiff's carpal tunnel syndrome, which restricted her from performing medium to heavy work (i.e., any position requiring "repetitive motion or frequent lifting of more than ten pounds") was insufficient to establish that the impairment disqualified her from a broad range of jobs. *Id.* at 372-73. Finally, in *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635 (2d Cir. 1998), the Second Circuit held that testimony suggesting that a plaintiff could only perform light or sedentary work merely established that the individual was disqualified from a "narrow range of jobs," and therefore was insufficient to establish that the plaintiff was disabled within the meaning of the ADA. *See id.* at 644-45. As a result, [a plaintiff] cannot avoid judgment as a matter of law simply by pointing to the [exertional] restrictions [a physician] placed upon his work.

*Id.* at 364-65.

"[A] temporary, non-chronic impairment of short duration is not a disability covered by the ADA." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (citing *McDonald v. Pa. Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 96 (3d Cir. 1995). Plaintiff advanced no argument and adduced no evidence that she has a record of a chronic impairment.

To the extent that plaintiff may argue, although she advances no such argument in her briefs, that she was regarded as having such an impairment, the court finds that this claim, too, is unsupportable. To prevail under the "regarded as" prong of the ADA's definition of disability, plaintiff must show that defendant "mistakenly believes that [plaintiff] has a physical impairment

that substantially limits one or more major life activities" or " mistakenly believes that an actual nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Plaintiff must show more than that defendant viewed her as impaired in some way, but rather that defendant viewed her as disabled within the meaning of the statute. *Rinehimer*, 292 F.3d at 381. Because plaintiff's only claim is that defendant viewed her as disabled from the major life activity of working by the physical restrictions imposed upon her by her physicians, and under *Marinelli* those kinds of restrictions are not substantial limitations, her claim is not cognizable under the ADA. Plaintiff cannot show that defendant regarded her as disabled within the meaning of the statute.

Because plaintiff failed to adduce sufficient evidence to establish that she was a qualified individual with a disability, that she has a record of such disability, or that she was regarded as having such a disability, she cannot make out a prima facie case of discrimination under the ADA or PHRA. Although plaintiff failed to establish a prima facie case of discrimination under the ADA and the PHRA, the court will assume for the purpose of argument that she did and will consider her claims under the analysis of the *McDonnell Douglas* framework.

## 2. Employer's Legitimate Business Reasons

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. *Burdine*, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see*

*generally St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. *Burdine*, 450 U.S. at 254; *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978).

Defendant offered the exhaustion of all available leave and plaintiff's inability to return to work for an indefinite period of time as legitimate, nondiscriminatory reasons for her termination. Defendant's reason for not offering an accommodation to plaintiff was the receipt of plaintiff's physician's prescription proscribing plaintiff from engaging in any work activity, such that no accommodation was reasonable, or, for that matter, possible. Defendant's failure to hire plaintiff to the staff attorney position with Health Plan was occasioned by Health Plan's non-receipt of the requisite permission from plaintiff's supervisor. The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763 (emphasis added) (citation omitted). The court is satisfied that defendant set forth legitimate, nondiscriminatory reasons for the adverse employment actions implicated here and met its burden of production.

### 3. Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes*, 32 F.3d at 763. Once the employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy

at least one of the two prongs articulated by the United States Court of Appeals for the Third

Circuit in *Fuentes*:

> the plaintiff must point to some evidence, direct or circumstantial,
> from which the fact-finder could reasonably either (1) disbelieve
> the employers articulated legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more likely than not a
> motivating or determinative cause of the employer's action.

*Id.* at 764.

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the

employer's articulated reason for the adverse employment action in order to overcome summary

judgment and bring his case to trial. To discredit the employer's articulated reason, the plaintiff

does not need to produce evidence that necessarily leads to the conclusion that the employer

acted for discriminatory reasons, *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995),

nor produce additional evidence beyond his prima facie case. *Fuentes*, 32 F.3d at 764. A

plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic],
> or contradictions in the employer's proffered legitimate reasons
> [such] that a reasonable factfinder could rationally find them
> "unworthy of credence" and hence infer that the proffered
> nondiscriminatory reason "did not actually motivate" the
> employer's action. [*Fuentes*, 32 F.3d] at 764-65 (quoting *Ezold v.
> Wolf, Block, Schorr, and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.
> 1992))**.**

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998).

### (a) Prong One

The question asked in prong one of the *Fuentes* test is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason for the adverse result

suffered by the plaintiff is discrimination. *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109

(3d Cir. 1997).  The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination.  *Ezold*, 983 F.2d at 527.  "Furthermore, the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court would then be impermissibly substituting its own business judgment for that of the employer."  *Moorer v. Verizon Commc'ns, Inc.*, No. 03-1265, 2005 WL 2807140, at *9 (W.D. Pa. Oct. 27, 2005), *aff'd*, 211 F. App'x 98 (3d Cir. 2006).  "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe it to [be] worthy of credence."  *Orenge v. Veneman*, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); *see Menta v. Cmty. Coll. of Beaver County*, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006).

Plaintiff offered several "inconsistencies and contradictions" in an attempt to satisfy the first prong of the *Fuentes* test.  In challenging the termination action, plaintiff argues that she was entitled to 120 hours of leave under UPMC's recruitment policy, she was eligible for six months of short-term disability coverage, and that she was willing to do anything UPMC asked of her to remain employed, challenging why UPMC did not place her in its award-winning Program.  The 120 hours of leave under UPMC's recruitment policy to which plaintiff claims to be entitled did not vest until after one year of employment by the terms of the agreement, and as such plaintiff was not entitled to the leave she claims.  The record also reflects that plaintiff did, in fact, receive the six months short-term disability benefits for which she was eligible.  Finally, defendant received a physician's prescription proscribing plaintiff from engaging in any work activity, such

that she was ineligible for participation in the Program, despite her verbal assurances contrary to her doctor's orders. The court cannot conclude that a reasonable jury could find defendant's stated reasons for plaintiff's termination were implausible or unworthy of credence.

With respect to her claim that defendant failed to accommodate her disability, plaintiff did not have medical clearance to engage in any work activity, making any accommodation unavailable. The Court of Appeals for the Third Circuit has held that failure to engage in what has come to be known as the "interactive process" in determining an appropriate reasonable accommodation for a disabled employee is an adverse employment action. "An employer commits unlawful disability discrimination under the ADA if he/she 'does not mak[e] reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability.'" *Conneen v. MBNA America Bank*, 334 F.3d 318, 325 (3d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)). A reasonable accommodation requires that steps be taken to "enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Reasonable accommodation "further includes the employer's reasonable efforts to assist [the employee], to communicate with [the employee] in good faith, and not to impede [the employee's] investigation." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997). This has been termed a duty to engage in the "interactive process." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004).

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been

> reasonably accommodated but for the employer's lack of good
> faith.

*Taylor*, 184 F.3d at 319-20 (citations omitted).

Although defendant had knowledge of plaintiff's disability, the second element of this test is in dispute, thereby making the third element contentious as well. The fourth element, however, is dispositive of plaintiff's failure to accommodate claim. If plaintiff is to be believed, her requested accommodation was to be assigned to sedentary work. This accommodation would be contradictory to the physician's prescription produced by plaintiff enjoining her from engaging in any work activity. While it is true that the employer must determine the extent of the employee's limitations, here the prescription submitted by plaintiff provided the limitations. Plaintiff's verbal assurances that contradicted the physician's order, if such assurances were in fact given, are insufficient to overcome the physician's directive. The interactive process creates an obligation on both parties. *Conneen*, 334 F.3d at 330; *Taylor*, 184 F.3d at 319-20; *Mengine*,114 F.3d at 420. If plaintiff believed she was able to do more than what was indicated on the prescription that she provided to her employer, she should have submitted a new or revised prescription. Were defendant to not honor the accommodation called for by the medical information plaintiff provided, defendant might open itself up to liability of a different stripe. *See Smith v. Henderson*, 376 F.3d 529, 537-38 (6th Cir. 2004) (forcing an employee to work in excess of medical restrictions would support a violation of the ADA). Considering the record before the court, no reasonable jury could find plaintiff was able to be reasonably accommodated by defendant.

Plaintiff claims that Health Plan failed to hire her for the staff attorney position, and that Ms. Nemeth assured her that the permission to transfer was sent via email. Plaintiff contends

that Ms. Jones was re-listing the posting on MyHUB solely for plaintiff's benefit, and was not going to do so until the permission was secured. Finally, Mr. Stillwagon sent plaintiff correspondence discussing the transfer request without mentioning anything about the materials being incomplete. Plaintiff, however, offered no substantive evidence that a written permission was sent. Plaintiff does not dispute defendant required written permission. Even assuming plaintiff is correct, plaintiff was limited by her physician from working, and would not have been able to accept the position. Under those circumstances, plaintiff cannot raise a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### (b) Prong Two

The court must next examine the second prong of the *Fuentes* framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a fact finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. *Simpson*, 142 F.3d at 644-45. Relevant evidence that could be relied upon in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. *Id.* at 645.

### (i) Previous Discrimination Against Plaintiff

Plaintiff's evidence of previous discrimination against her consists of a single incident in which, after allegedly being informed of plaintiff's desire to secure a less physically demanding position, Ms. Nemeth angrily replied "be sure you can do the next job you take." (JS ¶ 101.) Even if this incident did occur, the isolated statement alone is insufficient to establish previous discrimination. It is well settled that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight." *Ezold*, 983 F.2d at 545.

### (ii) Discrimination Against Others Within a Protected Class

Plaintiff adduced no evidence in the record that defendant discriminated against other people within the plaintiff's protected class or within another protected class.

### (iii) More Favorable Treatment of Similarly Situated Persons Not Within the Protected Class

Plaintiff's evidence of the third element, whether the employer has treated more favorably similarly situated persons not within the protected class, consists of defendant's hiring a non-disabled person for the staff attorney position for which plaintiff applied. Plaintiff, however, did not adduce sufficient evidence to overcome defendant's assertion that plaintiff's application for the position was incomplete. Plaintiff cannot establish that she was similarly situated to the successful candidate for the position unless she can show that the individual selected for the position likewise submitted an incomplete application. Because the record is devoid of any such evidence, and because the burden is on the plaintiff, the court finds that plaintiff failed to adduce sufficient evidence that she and the successful candidate for the staff attorney position were similarly situated.

Under these circumstances plaintiff did not adduce sufficient evidence, with respect to any of her discrimination claims, to show defendant's stated reasons for her termination or any other adverse employment action against her were pretextual. Summary judgment will be granted in favor of defendant with respect to plaintiff's claims for discrimination under the ADA and PHRA.

**IV. Retaliation Claims**

Plaintiff contends that her termination and her failure to be hired to the staff attorney position at Health Plan were the result of retaliation for engaging in the protected activities of filing a worker's compensation claim on January 5, 2006, and filing a discrimination claim with the EEOC on March 30, 2006. Retaliation claims brought under the ADA and the PHRA follow the *McDonnell Douglas* framework. *Williams*, 380 F.3d at 759 n.3. To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity (i.e. filing a claim for worker's compensation); (2) the defendant took adverse employment actions against her, and (3) there was a causal connection between the adverse action and her protected activity. *Fogelman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).

It is undisputed that plaintiff engaged in protected activities satisfying the first element of the prima facie case by (1) filing a worker's compensation claim on January 5, 2006 and (2) filing a complaint with the EEOC on March 30, 2006. The court is satisfied that plaintiff's termination and her failure to be hired to the staff attorney position constitute adverse employment actions. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

The third element requires plaintiff to present sufficient evidence of a causal link between her protected activity and the adverse action by her employer. To establish a causal connection,

plaintiff must show either temporal proximity between the protected activity and the adverse employment action, or evidence of ongoing antagonism. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. *Id.* ("[T]emporal proximity . . . is sufficient to establish the causal link. . . . [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action. *Id.* While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great. *See Williams*, 380 F.3d at 760 (3d Cir. 2004) (two months too long to permit an inference of causation); *George v. Genuine Parts Co.*, No. 04-108, 2007 WL 217684, at *11 (W.D. Pa. Jan. 25, 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) ("Temporal proximity between the protected activity and the termination is sufficient to establish the causal link."); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (causal link established where plaintiff

discharged two days following employer's receipt of the plaintiff's EEOC claim); *but cf. Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "[e]ven if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation).  Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).  For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. *Abramson*, 260 F.3d at 289 ("[h]ere, as we found in our discussion of the discrimination claim, [the plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-54 (3d Cir. 1997); *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986).

Plaintiff argues that the temporal proximity between the filing of the worker's compensation claim and the subsequent adverse employment actions is unusually suggestive and is enough, standing alone, to create an inference of retaliation.  Specifically, plaintiff argues less than three weeks elapsed between her worker's compensation claim and her termination, and less than three months elapsed between that same protected activity and the filling of the staff

attorney position with Health Plan for which she applied. Plaintiff also argues that the staff attorney position was filled after her charge of discrimination was filed with the EEOC.

There are times that temporal proximity alone can establish causation. *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001) (citing *Jalil*, 873 F.2d at 708). When temporal proximity alone is not clearly suggestive of discriminatory animus, other evidence of retaliatory motivation must be shown. *Williams*, 380 F.3d at 760. Such evidence may manifest itself as, although is not limited to, an intervening "pattern of antagonism." *Woodson*, 109 F.3d at 920-21 (3d Cir. 1997); *see also Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993). "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar*, 109 F.3d at 178. "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Id.*

In the instant matter, the court notes that the time between plaintiff's protected conduct and the adverse employment actions of which plaintiff complains is a very short span and arguably may give rise to an inference of retaliatory animus for purposes of establishing a prima facie case. The court, however, cannot ignore that plaintiff's worker's compensation claim was filed at the insistence of Ms. Nemeth and Ms. Kolo, and that plaintiff contends that she never intended to pursue a claim. Under these circumstances, it cannot be assumed that, after instructing plaintiff to file a claim, these same individuals would then discriminate against her for doing so. Plaintiff failed to adduce sufficient evidence for the court to find that Ms. Jones, Mr.

Stillwagon, or anyone at Health Plan was aware of her worker's compensation claim.  "It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."  *Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002).  Although plaintiff asserts that there was some type of systemwide information sharing among the business units of UPMC, she offered no evidence that such a policy actually existed.  The court finds that plaintiff's assertion, which is based upon speculation, does not constitute substantial evidence for purposes of overcoming summary judgment.  *See Griesbaum v. Aventis Pharms., Inc.*, 259 F. App'x 459, 466 n.10 (3d Cir. 2007) (Mere speculation, "absent specific facts or reasonable inferences, is simply not enough to overcome a motion for summary judgment.");  *Harter v. Gaf Corp.*, 967 F.2d 846, 852 (3d Cir. 1992) (a plaintiff "cannot merely rely upon conclusory allegations in his [or her] pleadings or in memoranda and briefs to establish a genuine issue of material fact").  With respect to her charge of discrimination filed with the EEOC on March 30, 2006, the court finds that plaintiff did not adduce sufficient credible evidence of an adverse employment action occurring contemporaneously with or after the filing of her charge.  Although plaintiff speculates that the staff attorney position for which she applied was filled *after* her charge was filed and notice of the charge was received by UPMC, she offered no substantive evidence to support her claim, i.e., presented no evidence that the decisionmakers were aware of this filing or otherwise.  The alleged unusually suggestive proximity between plaintiff's claim and adverse employer actions is insufficient to establish causation.

The court must look to the "entire record before us" to determine whether the causation element is met, and consider whether factors such as intervening antagonism, retaliatory animus,

and inconsistencies in the employer's articulated reasons for the adverse employment actions exist. *Farrell*, 206 F.3d at 280-82.

Plaintiff failed to produce evidence of intervening antagonism or retaliatory animus in the record. The evidence adduced to show inconsistencies in defendant's articulated reasons for the adverse employment actions are indistinguishable from the evidence plaintiff offered to show pretext, which the court has already found to be insufficient. Under these circumstances, she cannot establish a prima facie case for retaliation. Even if she had established a prima facie case, she could not establish pretext for the reasons already discussed relating to her discrimination claims. Therefore, plaintiff's retaliation claims under the ADA and PHRA must necessarily fail and summary judgment will be entered in favor of defendant with respect to those claims.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment will be granted. An appropriate order shall issue herewith.

By the court:

 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

dated: March 20, 2009